# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MONDREA VINNING,

      Petitioner,

         v.

JASON GARNETT, Warden Lawrence
Correctional center,

      Respondent.

No. 03 C 2106
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

The petitioner seeks a writ of habeas corpus based on his contention that the dictates of

*Doyle v. Ohio,* 426 U.S. 610 (1976) have been violated. The facts as stated in the Appellate

Court are not in dispute and, since the Appellate Court expressly considered the claim made here,

I set forth the relevant portions of its opinion in *People v. Vinning,* 1-99-3216 (Ill. App. 1st Dist.

2001).

> "Following a jury trial, defendant Mondrea Vinning was convicted of two
> counts of home invasion and two counts of armed robbery. The trial court
> sentenced defendant to four concurrent sentences of 26 years in prison...
>
> The following relevant testimony was adduced at trial. Mondean Harris
> testified that at about 10:30 p.m. on January 20, 1999, she went to an apartment
> building at 2409 East 73rd Street where her friend Telefrieda Watson lived. Harris
> was bringing Watson money from a record store that Watson owned. Harris
> entered the vestibule, rang a doorbell and waited to be buzzed into the building. A
> man Harris identified in court as defendant entered the vestibule and asked Harris'
> name. Harris asked him who he was and what he wanted. Defendant pulled out a
> gun and said he wanted her gold chain. The door buzzed to let Harris into the
> building and Harris testified that defendant and two men followed her inside.
> Harris testified defendant wore a hooded shirt and blue jeans and was "a couple
> inches" taller than she. Harris said she was five feet six inches tall.
>
> Defendant and the two men followed Harris to Watson's apartment.
> Defendant put his gun under Watson's chin and tried to remove her jewelry as the

other men entered the apartment. Both of those men wore masks, and one wore a white jacket and walked with a limp. Defendant took two pairs of earrings from Harris, and the man in the white jacket took about $600 from Harris' purse. Chris Barlow, Watson's son, entered the apartment and was struck in the face with a gun by one of the masked men. Those men left the apartment and as defendant went to the door, Harris pushed defendant out the door and locked it.

About four days later, Harris and Watson went to the police station at 111th Street and picked defendant's picture from a book of photographs. Harris and Watson learned defendant's name and told Kevin Barlow, a relative of Watson's. On January 30, Harris and Watson identified defendant in a police lineup.

On cross-examination, Harris said she described defendant to police on the night of the incident but denied telling the officers that defendant was five feet six inches tall. Harris said she knew before viewing the lineup that Kevin Barlow had beaten up defendant and that in the lineup, defendant's face was bruised while no other man in the lineup exhibited similar injuries. When describing defendant to police, Harris said he did not have facial hair.

Watson testified that when the doorbell rang in her apartment, she looked out the window and saw a man in a white jacket on crutches walking quickly toward the building's entrance. Watson buzzed Harris into the building, and defendant and two men entered with her. One of them asked if Chris was home, and Watson replied she was home alone. Defendant demanded Watson's jewelry, and she gave him several rings and bracelets. Watson said defendant was wearing a black hooded sweatshirt with the hood up but she could see his face clearly. The two other men wore ski masks, and one wore a white jacket and walked with a limp.

Watson said she picked defendant's picture from a photo book and identified him in a police lineup. Watson also identified pictures taken at an event at her record store and identified defendant in one photo making a hand gesture that a prosecutor referred to as a "gang symbol."

On cross-examination, Watson stated she described defendant to police as five feet six inches tall and weighing about 210 pounds. Before viewing the police lineup, she knew that defendant had been beaten up.

Cook County Assistant State's Attorney Jennifer Coleman testified that on the night of the crime, she interviewed Watson and Harris, as well as Kevin Barlow, who had been charged with battery against defendant. Coleman also interviewed defendant on January 29 at South Shore Hospital after advising him

of his *Miranda* rights. Defendant told Coleman that he knew Kevin Barlow by the nickname "Paco." When asked his whereabouts on the night of the offense, defendant said he spent most of the day with his fiancé. When Coleman asked defendant where he was later that evening, defendant said he pawned a gold necklace and was with his fiancé the entire night. Coleman described defendant's demeanor during the interview as "fairly hostile" and that he "got a little bit more aggressive" when he was asked about pawning the necklace. Defendant then told Coleman that he would not talk to her any more.

On cross-examination, Coleman stated that defendant had a head injury at the time of the interview and that his hands were bandaged. Coleman did not know if defendant was on medication during the interview but said he was lucid.

For the defense, Cheryl Lewis testified that on the night of the crime, she and defendant had dinner at her apartment and watched movies. Lewis testified that defendant remained at her apartment all night. She stated she was not defendant's fiancé but was a "friend of the family." Lewis described defendant as between six feet one inch and six feet two inches tall and weighing about 240 pounds and said he wore a mustache and goatee in January 1999. On cross-examination, Lewis said she and defendant lived together at the time of the offense and had lived together for about a year.

Chicago Police Detective Durrell Easter testified he was present when Harris and Watson made their statements to police and that Harris said defendant hit Chris Barlow twice in the face with a pistol. Easter stated that Watson said she saw defendant walking with crutches on the night of the incident. At the close of evidence, the jury convicted defendant of two counts of home invasion and two counts of armed robbery. The trial court sentenced defendant to four concurrent sentences of 26 years in prison.

On appeal, defendant first contends that the prosecution engaged in multiple instances of misconduct that denied him a fair trial and warrant reversal of the jury's verdict. Specifically, defendant argues that the prosecution [among other things] improperly (1) violated his right to remain silent when it presented testimony that defendant stopped his interview with Coleman and also erred in referring to that silence in closing argument...

Defendant ... asks us to review as plain error the numerous comments to which his counsel did not object and did not include in a post-trial motion. The plain error rule is applicable "where the evidence is closely balanced, so as to preclude the argument that an innocent person may have been wrongly convicted" or "where the error is of such magnitude that there is a substantial risk that the accused was denied a fair and impartial trial, and remedying the error is necessary

to preserve the integrity of the judicial process." *People v. Nielson,* 187 Ill. 2d 271, 297, 718 N.E.2d 131, 147 (1999). We do not find the evidence in this case to be closely balanced, since Watson and Harris identified defendant in a police lineup and offered testimony substantially consistent with each other's accounts and that of other witnesses.

We find one of defendant's claims of error worthy of analysis under the second prong of the plain error rule. Under *Doyle v. Ohio,* 426 U.S. 610, 619,49 L. Ed. 2d 91, 98,96 S. Ct. 2240, 2245 (1976), the mention of a defendant's post-arrest silence can violate his or her right to due process. However, we disagree with defendant's assertion that *Doyle* was violated in this case. Where a defendant has expressly waived his right to remain silent and has made a statement, the *Doyle* rule is generally inapplicable. *People v. Mata,* 243 Ill. App. 3d 365, 376, 611 N.E.2d 1235, 1243 (1993). Here, Coleman testified that after defendant was advised of his *Miranda* rights, she asked if he knew Kevin Barlow. Defendant replied he knew him as Paco and knew where he lived but had never been to Paco's home. Defendant then said he spent the day of the crime with Cheryl and gave details regarding what he and Cheryl did that day.

When asked about defendant's demeanor during the interview, Coleman testified:

> "It was fairly hostile during the entire interview. [Defendant] got a little bit more aggressive towards the end when I was asking him the specifics about the gold necklace – specifically, I asked him what pawn shop he went to and he refused to tell me; and I asked him who the gold necklace belonged to that he was pawning and where he got it from, and he wouldn't tell me; and at that, he said he wouldn't talk to me any more."

As shown in Coleman's testimony, defendant did not refuse to give a statement at the outset but instead began to answer Coleman's questions and then stopped the interview himself. Defendant's interview is similar to that in *People v. Martinez,* 86 Ill. App. 3d 486, 408 N.E.2d 358 (1980). In *Martinez,* this court determined that *Doyle* was not violated when the interviewing officer testified he told defendant he was collecting defendant's cigarette butts to be compared to a butt found at the crime scene. *Martinez,* 86 Ill. App. 3d at 487-88, 408 N.E.2d at 360. The officer asked the defendant his brand of cigarettes and told defendant that a butt at the scene matched his brand and not that of the victim, and the officer testified that defendant "got rather ruffled and got up and walked out of the room and stated that he had talked to me enough and didn't want to talk to me any longer. At that time, the interview was terminated." *Martinez,* 86 Ill. App. 3d at 488, 408 N.E.2d at 360. This court found that mentioning the fact that the

interview ended at the defendant's request could not be considered an impermissible comment on his silence, noting that defendant had not remained silent but instead had chosen to talk to the officer and later end the conversation. *Martinez,* 86111. App. 3d at 489, 408 N.E.2d at 361. A similar situation occurred here, and defense counsel did not object to any part of Coleman's testimony relating to defendant's interview. Although the prosecution briefly recounted Coleman's testimony in closing argument, defendant's termination of the interview was not emphasized. For those reasons, we reject his argument on that point...

> Affirmed in part, vacated in part.

> GALLAGHER, P.J., with BUCKLEY and O'BRIEN, JJ., concurring."

There is an arguable question as to whether state remedies are exhausted but respondent has expressly waived the exhaustion requirement–an act which the Attorney General of Illinois is entitled to do.[1]

The Appellate Court considered the precise claim made here. To secure the writ, petitioner must show that the Appellate Court's decision is contrary to or employs an unreasonable application of United States Supreme Court precedent.

His petition fails under this standard. Proving the defendant refused to answer some questions after agreeing to speak to police after warnings does not violate *Doyle.* This seems to be a clear teaching of *Anderson v. Charles,* 447 U.S. 404, 408 (1980). There is significant precedent to support the proposition that refusal to answer some questions after answering others is admissible as is the ending of the interrogation after the refusal of specific questions. The

---

[1]Her reason for doing so is that petitioner has not been able to secure a hearing in state court despite reasonable efforts to do so under the doctrine in *Lane v. Richards,* 957 F.2d 363 (7th Cir. 1992). By October of 2004 the petitioner had asked for new counsel or the right to represent himself and have the case heard within 6 months. There appears to be no action by the state court on this request.

precedent is found in several circuits including this one. See *Phelps v. Duckworth,* 772 F.2d 1410 (7th Cir. 1985) *Rowan v. Owens,* 752 F.2d 1186 (7th Cir. 1984) *United States v. Davenport,* 929 F.2d 1169 (7th Cir. 1991). The issue has troubled some courts but the Appellate Court's decision is neither contrary to nor an unreasonable application of Supreme Court precedent.

The petition fails on procedural default grounds as well. The alleged *Doyle* violation was not objected to at trial. The essential reason that the issue was not preserved at trial is because, in my view, a *Doyle* error cannot be shown to have occurred. The fact that the state court addressed the issue under plain error review does not excuse the default. *Rodriguez v. McAdory,* 318 F.3d 733, 735 (7th Cir. 2003). The failure of defense counsel to object was attacked on appeal but then was not raised in the Petition for Leave to Appeal. *White v. Godinez,* 192 F.3d 607,608 (7th Cir. 1999) The opening that is left for extraordinary cases involving claims of innocence does not apply here since there is no such claim. The evidence may be, as petitioner says, "not overwhelming" but it is far from weak as the Appellate Court so found.

I sympathize with the frustration in post-conviction adjudication that petitioner experienced in state courts but, with the waiver of an exhaustion objection, I have, however, ruled on his petition within the six months he asked for in the state system.

The petition for a writ of habeas corpus is DENIED.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: February 8, 2005